UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PSI MIDSTREAM PARTNERS. L.P. § § § § V. § § TARGA LIQUIDS MARKETING § AND TRADE, L.L.C. § | CIVIL ACTION NO. 4:15-CV-03252 |

COMPLAINT
AND APPLICATION FOR INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff PSI Midstream Partners, L.P. complains of Defendant Targa Liquids Marketing and Trade LLC and would show the Court as follows:

## I.   JURISDICTION AND VENUE

1. Plaintiff brings this action for actual damages, exemplary treble damages, prejudgment interest, attorneys' fees, and injunctive relief for violations of the federal antitrust laws, 15 U.S.C.A. §§ 2 and 13, and for violations of Texas state law. This Court has jurisdiction over the federal causes of action pursuant to 15 U.S.C.A. § 15 and 26, 28 U.S.C.A. §§ 1331 and 1337 and, over the state law causes of action, under the principles of supplemental jurisdiction, 28 U.S.C.A. § 1367.

2. Venue is proper in the Southern District of Texas – Houston Division under 15 U.S.C.A. §§ 15 and 22 and 28 U.S.C.A. § 1391 because Defendant Targa Liquids Marketing and Trade LLC's primary place of business is found in this District.

## II.    PARTIES

3. Plaintiff PSI Midstream Partners, L.P. ("PSI") is a Texas limited partnership that has its principal place of business in Houston, Texas. At all times relevant herein, it was and is engaged in processing natural gas in interstate commerce.

4. Defendant Targa Liquids Marketing and Trade LLC ("Targa") is a Delaware Limited Liability Company that has its principal place of business in Houston, Texas. At all times relevant herein, Defendant was and is engaged in processing natural gas liquids in interstate commerce. Targa may be served with citation by delivering a copy of this complaint by certified United States mail, return receipt requested, to its agent for service of process, C.T. Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

## III.    FACTUAL BACKGROUND

**A.    Natural Gas Processing and Natural Gas Liquids Industry**

5. Natural gas when used by consumers consists almost entirely of methane. However when it is produced it contains, in addition to methane, an array of other hydrocarbons, principally ethane, propane, butane, and pentanes. In addition, raw natural gas contains water vapor, hydrogen sulfide ($H_2S$), carbon dioxide, helium, nitrogen, and other compounds that need to be removed to create merchantable quality gas. Some of the natural gas liquids and impurities will be separated at the wellhead. But for gas rich in hydrocarbons and gas impurities, additional processing will be necessary. Natural gas processing consists of separating the various hydrocarbons and fluids and impurities from the gas, to produce what is known as 'pipeline quality' dry natural gas. Major transportation pipelines usually impose restrictions on the make-up of the natural gas that is allowed into the pipeline. That means that before the natural gas can be transported it must be processed to meet the restrictions.

6. The products removed from the gas through processing such as ethane, propane, butane, iso-butane and natural gasoline are valuable products known as natural gas liquids ("NGLs"). These NGLs are sold separately and have a variety of different uses; including enhancing oil recovery in oil wells, providing raw materials for oil refineries or petrochemical plants, and as sources of energy.

7. The removal of these products is accomplished at gas processing plants. In the coastal areas of Texas and Louisiana at issue in this case, there are several natural gas "straddle plants" that process gas produced from offshore platforms and coastal producing fields. These straddle plants are typically on interstate pipelines. A "straddle plant" is a natural gas processing plant constructed on a transmission pipeline downstream from the point where the natural gas in the pipeline has been produced. Generally, the straddle plant does not purchase and resell natural gas, but provides only a processing service for the owner of the natural gas or of processing rights to the natural gas.

B. The Parties and the Contract

8. PSI is a midstream asset company focusing on gas gathering, processing and conditioning to support oil and gas production activities in Texas, Louisiana and the Gulf of Mexico areas. It operates a straddle plant for gas processing plant on the pipelines operated by Transco and others located in Cameron Parish, Louisiana ("Cameron Meadows"). This plant has been operated continuously by PSI and its predecessors in interest for many decades. The Cameron Meadows Gas Processing Plant was purchased by PSI in November of 2009 and currently consists of the "Cameron Train" with a capacity of 300 MMcfd. The Cameron Meadows facility processes natural gas from at least 18 oil and gas producers on Transco's North

3

High Island System and Transco's West Cameron System.[1] The facility also processes natural gas from third-party pipelines, such as Kinetica and others. At Cameron Meadows, PSI separates the NGLs from the gas and returns the dry gas to the Transco and Southwest Lateral pipeline systems for further distribution.

9. After separating out the dry gas, PSI is left with a raw mix of NGLs or what is also known as a "Y-grade" stream. Raw mix NGLs are typically transported to a centralized facility for fractionation where the mixed NGLs are separated into discrete NGL products such as ethane, propane, normal butane, iso-butane and natural gasoline. In this case, PSI's facility at Cameron Meadows has, for decades, sent its products by a pipeline (owned by Targa) to the fractionation facilities (owned by Targa) located in Lake Charles, Louisiana for further processing. Beginning on November 1, 2015, Targa refused to take this raw mix of NGLs, thus shutting Cameron Meadows down completely.

10. The facilities that are involved in this case all date back decades to a common service structure. At one point, Mobil Oil built and operated the Cameron Meadows plant with a pipeline to a Mobil fractionator located in Beaumont, Texas. When the integrity of that pipeline failed almost a quarter-century ago, Mobil tied Cameron Meadows into the OXY pipeline leading to the OXY fractionator in Lake Charles. The original owners of each of these assets sold off the pieces of this system over time and—while PSI now owns the straddle plant—the Lake Charles fractionator and the pipeline for the delivery of raw mix are all now owned by Targa. Nevertheless, no matter who owned each of the facilities, the raw mix NGLs from the Cameron Meadows plant have been delivered by pipeline to the fractionator located at Lake

---

[1] Transco is a subsidiary of Williams Companies that operates an interstate pipeline transporting natural gas from South Texas to New York City.

Charles without interruption for several decades before Targa or PSI ever owned any of the facilities.

11.     Targa also owns the Barracuda gas processing plant, also located in Cameron Parish, LA, adjacent to and a direct competitor of PSI's Cameron Meadows facility.  The Barracuda plant also delivers its raw mix to the Lake Charles fractionators utilizing the same NGL pipeline serving Cameron Meadows.  Now that Targa refuses to transport and process Cameron Meadows' NGLs for fractionation at Lake Charles, Southwest Louisiana gas producers have only one option for gas processing: Targa's Barracuda plant.

12.     PSI acquired the Cameron Meadows plant from WFS-Liquids Company ("WFS"), a subsidiary of Williams, in 2009.  Prior to that date, WFS had entered into a contract with Targa for the delivery of raw mix NGLs at the tailgate of Cameron Meadows.  PSI acquired the original Hydrocarbon Exchange Agreement that was effective as of November 1, 2008 ("2008 Exchange Agreement") when it acquired the Cameron Meadows Plant from WFS.  When that Agreement expired in 2013, Targa entered a new Hydrocarbon Exchange Agreement ("2013 Exchange Agreement") directly with PSI under terms which PSI accepted under duress.

13.     Under the Exchange Agreements, raw mix NGLs are delivered to Targa's pipeline at the tailgate of the Cameron Meadows plant.  The raw mix is exchanged for the delivery of an equal volume of the products that make up the raw mix delivered to PSI at storage facilities operated by Targa located at Mont Belvieu, TX.  PSI pays Targa a fee that is calculated based on formula set forth in the 2013 Exchange Agreement.  Under the current agreement the fee is approximately $4.536 per barrel as of September 2013.

C.      **The Negotiations to Renew the Exchange Agreements**

14.     The 2008 Exchange Agreement was for a Primary Term of five years ending on October 31, 2013.  Thereafter, the parties were able to negotiate the 2013 Exchange Agreement

with a term of two years, expiring on October 31, 2015.  The 2013 Exchange Agreement doubled the fees for Targa's services and provided for a guaranteed minimum volume sent to Targa's fractionator with a requirement that PSI pay fees on any volume shortfall no matter the cause of the interruption—including interruptions *caused by Targa*.  In addition, PSI was required to provide a $7,000,000.00 irrevocable standby letter of credit to cover deficiencies if PSI was unable to fulfill its volume requirements or otherwise failed to compensate Targa in accordance with the Agreement. Even without considering the greatly-increased costs, the conditions imposed exceeded the standard in the industry and were suspicious given that PSI had never missed a payment, been delinquent or late on any payment due to Targa under the agreement. However, given that Targa controlled the only outlet for raw make at Cameron Meadows, PSI lacked bargaining power to strike a more commercially reasonable deal.

15. For the next two years, the parties acted under the 2013 Exchange Agreement without incident and, again, PSI was never delinquent or otherwise missed a payment to Targa. In mid-October 2015, anticipating that Targa would renew the 2013 Exchange Agreement, PSI made nominations for November 2015 deliveries to Targa's fractionator which Targa did not challenge.  Then, on Wednesday, October 28, 2015, Targa informed PSI that it would not amend the existing agreement or even consider entering into a new Exchange Agreement and would shut PSI out of the pipeline and fractionator entirely as of midnight, October 31, 2015.

16. Lee Powell, President of PSI Midstream, LLC, immediately contacted Targa representatives seeking to renew the Agreement on whatever reasonable terms Targa was prepared to offer for either a month-to-month or year-to-year term.

17. On October 28, 2013, Michael A. Heim, President and Chief Operating Officer of Targa Resources sent Lee Powell of PSI an email stating that they did not intend to renew any fractionation agreement with PSI.

18. On October 30, 2015, Lee Powell sent back an email seeking to "work thru any short term solution to maintain fractionation access for all [Cameron Meadows] …facilities. Getting a call without any warning except 2 days ago that we are not even going to discuss alternative contract options is commercially [un]reasonable - particularly if your plan is to continue operating the Barracuda Plant or Lowery Plant after tomorrow."  Later that day, Michael Heim responded that he did not see what difference it would make to renew PSI's contract for even a few days when Targa was not going to deal with PSI anymore.

19. PSI tried to negotiate further and, on October 30, 2015, pointed out that Targa's actions would effectively put the Cameron Meadows plant out of business even while Targa's Lake Charles fractionator continued to process raw make from Targa's own adjacent Barracuda gas processing plant.

20. On October 31, 2015, Targa closed the valve to its pipeline connection at Cameron Meadows and shut off PSI's access to the Lake Charles fractionator.  This has resulted in PSI shutting down all Cameron Meadows operations and its employees there are now without work.  At least 18 offshore oil and gas producers are now denied gas processing services at PSI's facility.  At least four producers were temporarily shut in pending the rerouting of their gas around the Cameron Meadows facility.  Those producers have since been given a temporary waiver from Transco and the Southwest Lateral pipeline system owners to enable delivery of the producers' unprocessed gas while Cameron Meadows is shut in and pending securing alternative processing solutions for that gas.  However, that waiver will not last for long as the delivery of

unprocessed gas does not meet pipeline specifications, is a potential safety hazard and could adversely impact pipeline integrity.

21. Targa knows that its pipeline and fractionator at Lake Charles were the only game in town for PSI. It is clear from Targa's action that it is trying to put PSI out of business so that it could benefit by taking over PSI's producer contracts and control, not only fractionation, but also gas processing in the Southwest Louisiana market.

D. **The Targa Pipeline and Fractionator Are the Only Game in Town**

22. PSI does not have fractionation facilities at Cameron Meadows. PSI's only market access to distribute its products is by delivery of raw make NGLs to Targa at the pipeline facilities attached at the tailgate of the Cameron Meadows plant.

23. Targa holds a monopoly on the processing of NGLs extracted at Cameron Meadows in that it controls the only economically viable delivery point for raw make NGLs with access to the only fractionator at which Cameron Meadows can feasibly deliver and process the NGL raw make that it manufactures. There are no other fractionators in the Cameron Parish, LA area. There is no other pipeline in the area that would be available to ship the NGLs to a third-party fractionator. Targa clearly understands its market positions and, in its recent 2014 10-K filing, described its Louisiana fractionation facilities as "key market centers for NGLs" in the Gulf Coast and pointed out that the "location and interconnectivity of these assets are not easily replicated, and [Targa] has sufficient capability to expand [its] capacity."

24. There is no other feasible form of transport to any market for the products manufactured by PSI at Cameron Meadows other than to be transported on the Targa pipeline to the fractionation facilities at Lake Charles.

25. It would not be feasible for PSI to build a pipeline that would allow it to access other fractionators. The closest facility other than the Targa Lake Charles fractionator would be

8

a facility operated by ExxonMobil near Beaumont, TX. Assuming that ExxonMobil would be willing to contract with PSI, those facilities are over 30 miles away, across a state line, under the Sabine River, and across untold marshes and wetlands. The permitting process would take years and the construction and operation of a pipeline would cost tens of millions of dollars. The average cost per mile for onshore pipeline construction on FERC applications submitted by June 30, 2012 was $3.1 million.[2] At that cost a 30-mile line would be over $93 million. That does not include right of way and other costs which could add millions more.

26.   It would not be feasible for PSI to construct its own fractionator at Cameron Meadows. According to Bentek Energy, an energy market analytics company, in 2012, a natural gas liquids fractionation facility would take 18 months to complete and would cost over $260 million. This cost does not factor in the regulatory and permitting issues involved and does not include the construction of rail and pipelines necessary to serve such a facility. Targa even reports that, in 2014, it invested $385 million to expand its existing Mont Belvieu, Texas fractionator by 100 MBbl/d of capacity. It would not be feasible for PSI to construct its own fractionator.

27.   The Targa pipeline to the Targa fractionator at Lake Charles is the only game in town for PSI and Targa knows it.

**E.   Targa Has Capacity at Lake Charles**

28.   There is no legitimate business reason for denying PSI access to deliver its products by pipeline to Targa's fractionator at Lake Charles.

29.   Targa is not currently utilizing all of its capacity for fractionating at Lake Charles. According to Targa's Form 10-K filed with the SEC for 2014, the fractionator at Lake Charles has the capacity to process 55,000 barrels of raw make NGLs daily. Through all of 2014 its

---

[2] Oil & Gas Journal, Feb. 4, 2013, footnote to Table 2.

average throughput was only 25,700 barrels per day. Through August 2015, the most recent available reported date, Targa's average daily production for 2015 is 32,079 barrels per day.[3] Even with at least seven different gas processing plants—including Cameron Meadows—supplying the Lake Charles fractionator,[4] the fractionator has only operated at 58.3% average daily capacity for 2015. Targa has excess capacity and no legitimate reason to deny PSI the right to process its raw make NGLs at Lake Charles. Processing NGL's from Cameron Meadows is not keeping Targa from taking advantage of other possible commercial opportunities.

30.     Similarly, Targa has capacity on the pipeline from Cameron, LA to Lake Charles to transport and deliver raw make NGLs from Cameron Meadows to Targa's Lake Charles fractionator.

F.     **Targa Competes with PSI for Producer Contracts**

31.     Targa competes directly with PSI in the gas processing market for contracts with producers.  Targa has recently invested in upgrading its straddle plants in Cameron Parish, LA to improve efficiency and has closed some of its own older plants—such as Stingray.  Nevertheless, in 2014, Targa's Barracuda straddle plant—which competes directly with Cameron Meadows—was only operating at 66.7% capacity.[5] For 2015, through August, its operations were only approximately 60.6% of total capacity.[6]  Targa's nearby Lowry straddle plant was operating at 52.3% capacity earlier this year and has now been shut down by Targa.[7] Targa's straddle plants

---

[3] January 2015 average daily production was 23,098 bbl ; February 2015: 30,659 bbl; March 2015: 40,480 bbl; April 2015: 39,178 bbl; May 2015: 39,211 bbl; June 2015: 24,986 bbl; July 2015: 31,929 bbl; August 2015: 27,094 bbl.

[4] Besides raw mix sent from Cameron Meadows and Barracuda, the Lake Charles fractionator receives raw mix NGLs by pipeline from Targa's Lowry Plant, Targa's Acadia Plant, Targa's Big Lake Plant, Plains/GDM Grand Cheniere Plant and the CrossTex/Enlink Sabine Plant.    In 2014, Targa closed its previously operational Stingray plant.

[5] 126.9 MMcf/d processed on capacity of 190.0 MMcf/d.

[6] For August 2015, Barracuda only operated at 45.7% capacity.  Barracuda's processed volumes have decreased every month in 2015.

[7] 138.7 MMcf/d processed on capacity of 265.0 MMcf/d.

10

have unused capacity and, with a new pipeline connection to Transco that Targa could arrange, they could compete for the same contracts with all the producers that PSI now has for processing gas at Cameron Meadows.

### IV.  TARGA'S ANTICOMPETIVE CONDUCT

32.  Until October 31, 2015, PSI was paying Targa over $350,000.00 a month to transport and process its raw make NGLs at the Lake Charles facility.  However, Targa now refuses to continue that relationship.  Targa's refusal to deal with PSI is unrelated to Targa's capacity to process NGLs in its fractionator.  Its refusal is unrelated to the capacity to move raw make NGLs on its pipeline from Cameron Parish, LA to Lake Charles.

33.  By denying PSI access to the Lake Charles fractionator, Targa has eliminated PSI as a competitor in the processing market—resulting in Targa's Barracuda plant becoming the only gas processor available to producers on Transco's North High Island and West Cameron systems and other third-party pipeline now connected to Cameron Meadows.

34.  By utilizing its monopoly on the pipeline for raw mix NGLs from the Cameron Parish, LA area and its monopoly on the fractionation business servicing that same area, Targa is unfairly excluding PSI from the relevant gas processing market and it will, eventually, swallow all of PSI's producer contracts.

35.  Targa's refusal has only one effect: destroying PSI's ability to participate in the marketplace.  This illegal restraint on trade would not only result in a death knell for PSI, but would result in the complete elimination of competition in the gas "cutting" market for coastal producers seeking to process their natural gas.  Producers will be forced to deal with Targa in the position of having the only processing facilities in Southwest Louisiana.  It will also result in reduced competition downstream in the market where processed gas and NGLs are sold.  Non-

party suppliers and consumers both upstream and downstream will be negatively impacted by Targa's illegal anticompetitive behavior.

36. Upon information and belief, PSI alleges that Targa's refusal to deal with PSI to provide pipeline transportation to and fractionation services at its Lake Charles facility is an illegal restraint of trade and an improper denial of access to an essential facility: the Lake Charles fractionator and the pipeline leading to it. Targa's actions are wholly anticompetitive and illegal.

## V. FIRST CLAIM FOR RELIEF:
### UNLAWFUL RESTRAINT OF TRADE (15 U.S.C. § 2)

37. Plaintiff incorporates herein by reference paragraphs 1 through 36 above as though fully set forth.

38. Targa has engaged in acts and conduct that have unreasonably and substantially restrained and continue to restrain interstate trade and commerce in the natural gas market as expressed in Section 2 of the Sherman Act.

39. As a direct and proximate result of the aforementioned unlawful practices, Plaintiff has been injured in its business. Plaintiff has been deprived of free competition in all of its markets and its business operations have been destroyed by Defendant's actions.

40. As a direct and proximate result of the aforementioned unlawful practices, Plaintiff has suffered actual damages in an amount to be determined at trial including, *inter alia*, loss of revenue, loss of profits, and loss of enterprise value.

## VI. SECOND CLAIM FOR RELIEF:
### UNLAWFUL PRACTICE IN RESTRAINT OF TRADE OR COMMERCE
### (TEX. BUS. & COM. CODE ANN. § 15.05)

41. Plaintiff incorporates herein by reference paragraphs 1 through 40 above as though fully set forth.

42. Targa has engaged in acts and conduct that have unreasonably and substantially restrained and continue to restrain trade and commerce in the natural gas market.

43. As a direct and proximate result of the aforementioned unlawful practices, Plaintiff has been injured in its business. Plaintiff has been deprived of free competition in all of its markets and its business operations have been destroyed by Defendant's actions.

44. As a direct and proximate result of the aforementioned unlawful practices, Plaintiff has suffered actual damages in an amount to be determined at trial including, *inter alia*, loss of revenue, loss of profits, and loss of enterprise value.

## VII. THIRD CLAIM FOR RELIEF:
### ANTICOMPETITIVE DISCRIMINATION IN PRICE, SERVICES AND FACILITIES
### (15 U.S.C. § 13 (E))

45. Plaintiff incorporates herein by reference paragraphs 1 through 44 above as though fully set forth.

46. Targa has illegally discriminated against PSI in that the access to the essential pipeline and fractionation facilities for the handling and processing of NGLs are not accorded to all purchasers, of which PSI is one, on proportionally equal terms.

47. Targa has illegally discriminated against PSI on the access to the essential pipeline and fractionation facilities for the handling and processing of NGLs in such a manner that the denial has unreasonably and substantially restrained and will continue to restrain interstate trade and commerce in the natural gas market.

48. As a direct and proximate result of the aforementioned unlawful practices, Plaintiff has been injured in its business. Plaintiff has been deprived of free competition in all of its markets and its business operations have been destroyed by Defendant's actions.

49. As a direct and proximate result of the aforementioned unlawful practices, Plaintiff has suffered actual damages in an amount to be determined at trial including, *inter alia*, loss of revenue, loss of profits, and loss of enterprise value.

### VIII. FOURTH CLAIM FOR RELIEF:
#### TORTIOUS INTERFERENCE WITH A CONTRACT

50. Plaintiff incorporates herein by reference paragraphs 1 through 49 above as though fully set forth.

51. PSI has valid contracts ("Producer Contracts") with numerous producers (the "Contracting Producers") who rely on Cameron Meadows for the processing of their gas. Targa, as a stranger to the agreements, willfully and intentionally, is interfering with the Producer Contracts.

52. Targa's improper denial of access to the pipeline and Lake Charles fractionator has resulted in PSI's complete inability to perform its contractual obligations to the Contracting Producers. PSI cannot perform any gas processing activities for its customers because PSI cannot send the resulting NGLs by pipeline to Targa or others for fractionation (and it cannot perform the fractionation itself.) Targa has refused to process NGLs related to the Producer Contracts and there is no legitimate business reason for doing so. PSI's customers are left without any choice for gas processing.

53. The wrongful actions of Targa have resulted in complete interference with the Producer Contracts, and PSI has suffered and will suffer actual damages as a result, including but not limited to loss of revenue, loss of profits, loss of enterprise value, potential liability or penalties under the Producer Contracts, and the cost of defending claims brought by the Contracting Producers, if any, in an amount to be determined at trial.

54. PSI is entitled to recover from Targa all damages it suffers as a result of their interference with the Producer Contracts. Moreover, Targa acted with malice to destroy PSI's business operations and, therefore, PSI is also entitled to recovery exemplary damages from Targa.

### IX.  FIFTH CLAIM FOR RELIEF:
### TEMPORARY RESTRAINING ORDER

55. Plaintiff incorporates herein by reference paragraphs 1 through 54 above as though fully set forth.

56. PSI has an immediate need for a temporary restraining order to prevent immediate and irreparable harm caused by Targa's denial of access to the raw make NGL pipeline and Lake Charles fractionation facility. The continued denial of access will result in the immediate destruction of Cameron Meadows as a going business concern. Even if this Court eventually grants injunctive relief, each day without gas production results in progressively-increasing restart costs to PSI associated with ever-longer idled equipment.

57. PSI has an immediate need to:

(a) Restore PSI's access to Targa's pipeline at the tailgate of the Cameron Meadows facility and accept and take delivery of PSI's raw mix NGLs at that delivery point and exchange the raw mix for the delivery of the Specification Products by Targa to PSI at Targa's facility in Mount Belvieu, Texas on the same contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015;

(b) Compel Targa to continue to receive and take delivery of raw mix at the tailgate of PSI's Cameron Meadows facility on the contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015 during the pendency of this Temporary Restraining Order.

58. The greater injury will result from refusing to grant the temporary restraining order than by granting it.

59.    The issuance of a temporary restraining order will not substantially harm any other interested persons.

60.    The issuance of a temporary restraining order will restore the parties to their status as it existed prior to the wrongful conduct of Targa.

61.    PSI has a substantial likelihood of prevailing on the merits.

62.    The temporary restraining order sought is reasonably suited to address Targa's improper denial of access to the essential raw make NGL pipeline and Lake Charles facility.

63.    The temporary restraining order will not adversely affect the public interest.

64.    PSI's arguments supporting its request for a temporary restraining order are further detailed in its Supporting Brief and Statement of Authorities for Application for Injunctive Relief filed concurrently with the Complaint.

65.    Pursuant to Fed. R. Civ. P. 65(c), PSI is ready to post bond in the amount the Court determines is reasonable. However, as previously discussed, the injunctive relief PSI seeks poses no real risk of harm to Targa. Therefore, PSI respectfully requests that the Court set the Bond at a nominal amount of $1,000.00.

WHEREFORE, PSI requests that the Court:

(i)    Restore PSI's access to Targa's pipeline at the tailgate of the Cameron Meadows facility and accept and take delivery of PSI's raw mix NGLs at that delivery point and exchange the raw mix for the delivery of the Specification Products by Targa to PSI at Targa's facility in Mount Belvieu, Texas on the same contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015;

(ii)    Compel Targa to continue to receive and take delivery of raw mix at the tailgate of PSI's Cameron Meadows facility on the contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015 during the pendency of this Temporary Restraining Order;

(iii)    Provide any and all additional relief the Court deems necessary to mitigate PSI's irreparable harm.

## X.   SIXTH CLAIM FOR RELIEF:
### PRELIMINARY INJUNCTIVE RELIEF

66. Plaintiff incorporates herein by reference paragraphs 1 through 65 above as though fully set forth.

67. PSI has an immediate need for a preliminary injunction to prevent immediate and irreparable harm caused by Targa's denial of access to the Lake Charles fractionation facility. The continued denial of access will result in the immediate destruction of Cameron Meadows as a going business concern. Even if this Court eventually grants injunctive relief, each day without gas production results in progressively-increasing restart costs to PSI associated with ever-longer idled equipment.

68. PSI has an immediate need to:

(a) Restore PSI's access to Targa's pipeline at the tailgate of the Cameron Meadows facility and accept and take delivery of PSI's raw mix NGLs at that delivery point and exchange the raw mix for the delivery of the Specification Products by Targa to PSI at Targa's facility in Mount Belvieu, Texas on the same contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015;

(b) Compel Targa to continue to receive and take delivery of raw mix at the tailgate of PSI's Cameron Meadows facility on the contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015 during the pendency of this Preliminary Injunction.

69. The greater injury will result from refusing to grant the preliminary injunction than by granting it.

70. The issuance of a preliminary injunction will not substantially harm any other interested persons.

71. The issuance of a preliminary injunction will restore the parties to their status as it existed prior to the wrongful conduct of Targa.

72. PSI has a substantial likelihood of prevailing on the merits.

17

73. The preliminary injunction sought is reasonably suited to address Targa's improper denial of access to the essential raw make NGL pipeline and Lake Charles facility.

74. The preliminary injunction will not adversely affect the public interest.

75. PSI's arguments supporting its request for a temporary restraining order are further detailed in its Supporting Brief and Statement of Authorities for Application for Injunctive Relief filed concurrently with the Complaint.

76. Pursuant to Fed. R. Civ. P. 65(c), PSI is ready to post bond in the amount the Court determines is reasonable. However, as previously discussed, the injunctive relief PSI seeks poses no real risk of harm to Targa. Therefore, PSI respectfully requests that the Court set the Bond at a nominal amount of $1,000.00.

WHEREFORE, PSI requests that the Court:

(i) Restore PSI's access to Targa's pipeline at the tailgate of the Cameron Meadows facility and accept and take delivery of PSI's raw mix NGLs at that delivery point and exchange the raw mix for the delivery of the Specification Products by Targa to PSI at Targa's facility in Mount Belvieu, Texas on the same contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015;

(ii) Compel Targa to continue to receive and take delivery of raw mix at the tailgate of PSI's Cameron Meadows facility on the contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015 during the pendency of this Preliminary Injunction;

(iii) Provide any and all additional relief the Court deems necessary to mitigate PSI's irreparable harm.

## XI.  JURY DEMAND

77. Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38.

## XII.   CONCLUSION AND PRAYER

WHEREFORE, Plaintiff PSI Midstream, L.P. prays for judgment against Defendant Targa Liquids Marketing and Trade LLC as follows:

1. For damages according to proof at trial.

2. For three times the amount of actual damages suffered by Plaintiff as a result of Defendant's violation of the federal and state antitrust laws.

3. For injunctive relief, until this matter is litigated at trial, restoring transportation to and processing of PSI's raw make NGLs from the Cameron Meadows tailgate to Targa's Lake Charles fractionation facility and exchange the raw mix for the delivery of the Specification Products by Targa to PSI at Targa's facility in Mount Belvieu, Texas on the same contractual terms and conditions as existed between PSI and Targa at 8:00 a.m. on October 31, 2015.

4. For prejudgment interest, costs of this suit, and attorney's fees as each is permissible under 15 U.S.C. § 15.

5. For such other and further relief as this Court deems just and proper.

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

 /s/ D. Mitchell McFarland
D. Mitchell McFarland
State Bar No.:  13597700
Fed. Bar No.: 2379
mmcfarland@munsch.com
700 Milam, Suite 2700
Houston, Texas 77002
Telephone:  (713) 222-1470
Fax:   (713) 222-1475

**ATTORNEY IN CHARGE**

                                                **PLAINTIFF PSI MIDSTREAM PARTNERS, L.P.**

**OF COUNSEL**
J. Mark Deaton
State Bar No. 24069588
Federal ID No. 1094927
700 Milam, Suite 2700
Houston, Texas 77002
Telephone:  (713) 222-1470
Fax:   (713) 222-1475
mdeaton@munsch.com